UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| Superstore Automotive, Inc. | Court File No.<br>Class Action |
| Plaintiff, | |
| vs. | **Complaint and**<br>**Demand for Jury Trial** |
| Delphi Automotive, LLP; Denso International America, Inc.; Furukawa Electric Co. Ltd.; Lear Corporation; Leoni AG; Sumitomo Electric Industries, Ltd.; S-Y Systems Technologies GMBH; TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc.; Yazaki Corporation; Yazaki North America, Inc. | |
| Defendants. | |

Plaintiff Superstore Automotive, Inc. ("Plaintiff"), on behalf of itself and all others similarly situated (the "Classes" as defined below), brings this class action for damages, injunctive relief and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, and consumer protection laws, demands a trial by jury, and alleges as follows:

## Nature of Action

1.     Defendants, the largest suppliers of Automotive Wire Harness Systems (defined below) globally and in the United States, engaged in a massive, decade-long conspiracy to unlawfully fix and artificially raise the prices of these products. Defendants' conspiracy successfully targeted the United States automotive industry, raising prices for car manufacturers, car dealers, and consumers.

2.     One of the Defendants, Furukawa Electric Co. Ltd., and three of its executives have already pleaded guilty to federal price-fixing and bid-rigging charges brought by the United States Department of Justice and have agreed to pay a $200 million fine for their misconduct.

3.       Plaintiff brings this action on behalf of itself and all entities and persons who purchased new motor vehicles containing Automotive Wire Harness Systems, replacement Automotive Wire Harness Systems and related parts during the period from and including January 1, 2000 up to and including the date of the filing of this Complaint (the "Class Period").

4.       "Automotive Wire Harness Systems" are automotive electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in an automotive vehicle. Essentially, Automotive Wire Harness Systems serve as the "central nervous system" of a motor vehicle. "Automotive Wire Harness Systems" include the following: automotive wire harnesses, automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, and power distributors.

5.       Defendants Delphi Automotive LLP ("Delphi"), Denso International America, Inc. ("Denso"), Furukawa Electric Co., Ltd. ("Furukawa"), Lear Corporation ("Lear"), Leoni AG ("Leon"), Sumitomo Electric Industries, Ltd. (Sumitomo"), S-Y Systems Technologies, GmbH ("S-Y Systems"), TRAM, Inc. d/b/a Tokai Rika U.S.A., Inc. ("Tokai), Yazaki Corporation, and Yazaki North America Inc. ("Yazaki") all collectively hereinafter referred to as "Defendants." manufacture, market, and sell Automotive Wire Harness Systems throughout the United States. The manufacture and sale of Automotive Wire Harness Systems is a multi-billion dollar industry.

6.       Defendants and other co-conspirators (as yet unknown) agreed, combined, and conspired to inflate, fix, raise, maintain, or artificially stabilize prices of Automotive Wire Harness Systems.

7.       Competition authorities in the United States, the European Union, and Japan have been investigating a conspiracy in the market for Automotive Wire Harness Systems since at

least February 2010. As part of its criminal investigation, the United States Department of Justice

("DOJ") is seeking information about anticompetitive conduct in the market for Automotive

Wire Harness Systems, and the Federal Bureau of Investigation ("FBI") has participated in raids,

pursuant to search warrants, carried out in at least some of the Defendants' offices. The European

Commission Competition Authority ("EC") has also conducted dawn raids at the European

offices of several of the Defendants.

8.     Recently, Defendant Furukawa and three of its executives pleaded guilty to a

criminal information brought by the United States, charging that, from at least as early as

January 2000 and continuing until at least January 2010, Furukawa and its co-conspirators

participated in a combination and conspiracy to suppress and eliminate competition in the

automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices

of, wire harnesses and related products[1] sold to automobile manufacturers in the United States.

The criminal information further charged that the combination and conspiracy engaged in by

Furukawa and its co-conspirators was in unreasonable restraint of interstate and foreign trade and

commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

9.     As part of its plea agreement, Furukawa has agreed to assist the DOJ in its ongoing

criminal investigation into the automotive parts industry.

10.     As a direct result of the anti-competitive and unlawful conduct alleged herein,

Plaintiff and the Classes paid artificially inflated prices for Automotive Wire Harness Systems,

related parts or vehicles containing Automotive Wire Harness Systems from entities that

purchased such from one or more Defendants during the Class Period.  Plaintiff and the class

members have thereby suffered antitrust injury to their business or property.

---

[1] The DOJ defined related products as automotive electrical wiring, lead wire assemblies, cable bond, automotive
wiring connectors, automotive wiring terminals, electronic limit control units, fuse boxes, relay boxes, junction
blocks, and power distributors.

## Jurisdiction and Venue

11.     Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiff also asserts claims for actual and exemplary damages pursuant to state antitrust, unfair competition, and consumer protection laws, and seeks to obtain restitution, recover damages and secure other relief against Defendants for violation of those state laws. Plaintiff and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from some Defendants.

13.     Venue is proper in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

14.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, *inter alia:* (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Automotive Wire Harness Systems throughout the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district. Defendants also conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States.

## Trade and Commerce

15.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States, and upon import trade and commerce with the United States.

16.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce, and Defendants' activities have a direct, substantial and reasonably foreseeable effect on such commerce.

17.     Defendants substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Classes. Defendants, directly and through their agents, engaged in activities affecting all states, to fix or inflate prices of Automotive Wire Harness

Systems, which conspiracy unreasonably restrained trade and adversely affected the market for Automotive Wire Harness Systems.

18.    Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Automotive Wire Harness Systems, including Plaintiff and the Classes.

## Parties

19.    Plaintiff Superstore Automotive, Inc. is a Minnesota company in the business of selling new and used motor vehicles through its car dealership operations.

20.    Plaintiff is an authorized Buick / GMC dealer and does business under the name White Bear Lake Superstore.

21.    During the period of anti-competitive price fixing by Defendants, Plaintiff purchased thousands of new automobiles and trucks with Automotive Wire Harness Systems from entities that purchased such from one or more Defendants.

22.    During the period of anti-competitive price fixing by Defendants, Plaintiff purchased Automotive Wire Harness Systems and related parts from entities that purchased such from one or more Defendants for use in the repair of automobiles and trucks.

23.    Defendant Delphi Automotive LLP is a Delaware corporation with its principal place of business in Troy, Michigan. Defendant Delphi manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

24.    Defendant Denso International America, Inc. is a Delaware corporation with its principal place of business in Michigan. Defendant Denso manufactured, marketed and/or sold

6

Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

25.     Defendant Furukawa Electric Co., Ltd. is a Japanese corporation. Defendant Furukawa manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

26.     Defendant Lear Corp. is a Delaware corporation with its principal place of business in Southfield, Michigan. Defendant Lear manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

27.     Defendant Leoni AG is a German corporation. Defendant Leoni manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

28.     Defendant Sumitomo Electric Industries, Ltd. is a Japanese corporation. Defendant Sumitomo manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

29.     Defendant S-Y Systems Technologies, GmbH is a German corporation. Defendant S-Y Systems manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

30.     Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A., Inc. ("Tokai") is a Michigan corporation with its principal place of business in Michigan. Defendant Tokai manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

31.     Defendant Yazaki Corp. is a Japanese corporation. Defendant Yazaki manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

32.     Defendant Yazaki North America Inc. is an Illinois corporation and has its principal place of business in Canton Township, Michigan. It is a subsidiary of and owned and controlled by its parent, Yazaki Corp. Yazaki Corp. and Yazaki North America Inc. are herein collectively referred to as "Yazaki."

## Agents and Co-Conspirators

33.     Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged.

34.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

35.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or Limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## Factual Allegations

### A.     The Automotive Wire Harness System Industry

36.     Automotive Wire Harness Systems comprise the "central nervous system" of an automotive vehicle and consist of the wires or cables and data circuits that run throughout the vehicle. To ensure safety and basic functions (e.g., going, turning and stopping), as well as to provide comfort and convenience, automobiles are equipped with various electronics which operate using control signals running on electrical power. The Automotive Wire Harness System is the conduit for the transmission of these signals and electrical power.

37.     Automotive Wire Harness Systems are installed by automobile original equipment manufacturers ("OEMs") in new vehicles as part of the automotive manufacturing process. They are also installed in vehicles to replace worn out, defective or damaged Automotive Wire Harness Systems.

38.     For new vehicles, the OEMs—mostly large automotive manufacturers such as Honda, Toyota, Volvo, and General Motors—purchase Automotive Wire Harness Systems directly from Defendants. Automotive Wire Harness Systems may also be purchased by component manufacturers who then supply such systems to OEMs. These component manufacturers are also called "Tier Manufacturers" in the industry. A Tier I manufacturer supplies Automotive Wire Harness Systems directly to an OEM.

39.     When purchasing Automotive Wire Harness Systems and related products, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers. Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for four to six years. Typically, the bidding process begins

approximately three years prior to the start of production of a new model. Japanese OEMs procure parts for U.S.-manufactured vehicles both in Japan and the United States.

40.     Defendants and the co-conspirators supplied Automotive Wire Harness Systems to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Automotive Wire Harness Systems (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

41.     Plaintiff and members of the proposed Classes purchased Automotive Wire Harness Systems indirectly from one or more of the Defendants. By way of example, automobile dealers indirectly purchase an Automotive Wire Harness System from Defendants when they purchase new vehicles to sell or lease to consumers.

42.     When repairing a damaged vehicle or where the vehicle's Automotive Wire Harness System is defective, Plaintiff and other automobile dealers indirectly purchase replacement Automotive Wire Harness Systems and related parts from entities who have purchased such products from Defendants.

43.     The global Automotive Wire Harness Systems market size reached US $21.9 billion in 2009, and increased by 32.2% to US $29 billion in 2010. According to *ResearchInChina*, a leading source for international market research and market data, the Automotive Wire Harness Systems market is steadily growing, and is expected to be US $32 billion in 2012.

44.     The global Automotive Wire Harness Systems market is dominated and controlled by large manufacturers, the top six of which are Defendants who control almost 90% of the global market; of those, four control almost 77% of the global market.

45.     Yazaki controlled almost 30% of the global market for Automotive Wire Harness Systems as of 2009. As it states on its website, its Automotive Wire Harness Systems are "used by every carmaker in Japan," and it "commands a top share in the global market." In fact, 77% of Yazaki's sales are from Automotive Wire Harnesses, and 37% of its 2007 sales were in Western Hemisphere. Yazaki's largest customers are Toyota, followed by Chrysler, Ford, Renault-Nissan, Honda, and General Motors. In the Western Hemisphere, it supplies Chrysler, Ford, General Motors, Honda, Isuzu, Mazda, Mitsubishi, Nissan, Renault, Subaru and Toyota.

46.     Defendant Sumitomo is the second largest manufacturer of Automotive Wire Harness Systems, and controls 24% of the global market.

47.     Delphi was the third largest maker of Automotive Harness Systems as of 2009. It controls 16.71% of the global market. Its two largest customers are General Motors and Ford.

48.     Defendant Lear controls almost 5% of the global market for Automotive Wire Harness Systems. Lear supplies Toyota, General Motors, Ford, and BMW.

49.     Defendant Furukawa controls almost 4% of the global market for Automotive Wire Harness Systems.

50.     Defendant Leoni controls 6% of the global market for Automotive Wire Harness Systems.

51.     By virtue of their market shares, Defendants are the dominant manufacturers and suppliers of Automotive Wire Harness Systems in the United States and the world.

**B.    Defendants Increased Prices for Automotive Wire Harness Systems Despite Steady Costs**

52.    In a competitive market, falling material and labor costs would lead to decreased prices because each competitor would be afraid that other competitors would attempt to take advantage of their lower costs to lower their prices in order to capture market share. The only economically rational action in such a situation is for each competitor to lower its own prices.

53.    In a market where ostensible competitors have engaged in a conspiracy to fix prices, however, competitors do not lower prices even when faced with steady or decreasing input costs. Such price decreases are unnecessary because the conspirators know that they will not lose sales to lower-priced competitors.

54.    The price of Automotive Wire Harness Systems increased during the Class Period, while major input costs virtually remained the same. In fact, according to *ResearchInChina*, Sumitomo and Furukawa own their own copper mines and effectively control their copper input costs. Copper is a major input cost component in the manufacture of Automotive Wire Harness Systems. In a competitive market, steady input costs should not have resulted in rising prices to Defendants' customers for Automotive Wire Harness Systems. Such anti-competitive price increases have resulted in Plaintiff and members of the Classes paying supra-competitive prices.

**C.    The Structure and Characteristics of the Automotive Wire Harness Systems Market Render the Conspiracy More Plausible**

55.    The structure and other characteristics of the Automotive Wire Harness Systems market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market. Specifically, the Automotive Wire Harness Systems market:

12

(1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

### 1. The Automotive Wire Harness Systems Market Has High Barriers to Entry

56. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

57. There are substantial barriers that preclude, reduce or make more difficult entry into the Automotive Wire Harness Systems market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor and long-standing customer relationships.

58. In addition, OEMs cannot change Automotive Wire Harness Systems suppliers randomly after they choose one because the OEMs design the features of their vehicles so that the Automotive Wire Harness System they purchase for a vehicle is then integrated with the electronics, mechanics, thermal distribution and other features of the particular vehicle model. Thus, the design must be synergized by Automotive Wire Harness Systems manufacturers and OEMs. It would be difficult for a new market entrant to do so.

### 2. There is Inelasticity of Demand for Automotive Wire Harness Systems

59. "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In

13

other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

60. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

61. Demand for Automotive Wire Harness Systems is highly inelastic. Demand for Automotive Wire Harness Systems is inelastic because there are no close substitutes for these products. In addition, customers must purchase Automotive Wire Harness Systems as an essential part of a vehicle, even if the prices are kept at a supra-competitive level.

### 3. The Market for Automotive Wire Harness Systems Is Highly Concentrated

62. A highly concentrated market is more susceptible to collusion and other anti-competitive practices.

63. As discussed above, Defendants dominate the Automotive Wire Harness Systems market. Six of the Defendants control almost 90% of the global market, and four of the Defendants control almost 77% of the global market: Yazaki controls almost 30%; Sumitomo controls 24%; Delphi controls 16.71%; Lear controls almost 5%; Furukawa controls almost 4%; and Leoni controls 6%.

### 4. Defendants had Ample Opportunities to Conspire

64. Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy. For example, Defendants have regularly

attended the annual Detroit Auto Show, which provided the means and opportunity to further the conspiracy alleged herein.

## D. Government Investigations

65.    A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of Automotive Wire Harness Systems.

66.    The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the EC. One carmaker is said to have failed to attract competitive bids for Automotive Wire Harness Systems, leading the company to join with other carmakers to take their complaint to the EC.

67.    On February 8, 2010, the EC executed surprise raids at the European offices of certain Defendants as part of an investigation into anti-competitive conduct related to the manufacturing and sale of Automotive Wire Harness Systems. The EC also carried out additional raids at the European offices of several suppliers of Automotive Wire Harness Systems on June 7, 2010. Specifically, EC investigators raided the offices of Leoni, S-Y Systems, and Yazaki. "The Commission has reason to believe that the companies concerned may have violated European Union antitrust rules that prohibit cartels and restrictive business practices," an EC official said in a statement.

68.    S-Y Systems has admitted that it is cooperating with the antitrust investigators. Lear's Chief Executive Officer Bob Rossiter has stated that Lear was notified by the EC that it is part of an investigation into anticompetitive practices among automotive electrical and electric component suppliers. In addition, Delphi has admitted to having "received a request for information from antitrust authorities at the European Commission seeking information about conduct by us in connection with an investigation in the European Union related to the electrical

and electronic components market." Delphi stated that it is cooperating fully with the European competition authorities. Leoni has also stated that it is cooperating with the antitrust investigators.

69.     In February 2010, Japan's Fair Trade Commission raided the Tokyo offices of Furukawa, Sumitomo, and Yazaki as part of an expansive investigation into collusion in the industry dating back to at least 2003.

70.     The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe. "The antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

71.     On February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation. The FBI executed warrants and searched the offices of these companies, including Yazaki's subsidiary in Canton Township, Michigan. Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

72.     In 2010, the FBI also raided the offices of Denso and Tokai and executed search warrants related to unfair competition, price-fixing and bid rigging of Automotive Wire Harness Systems.

73.     To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant—that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a

seemingly lawful business would uncover evidence of antitrust violations and that claimed

evidence must have been examined and accepted by a magistrate. That belief, which was

recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy

information.

### E.    Guilty Pleas

74.    On September 29, 2011, the DOJ announced that Defendant Furukawa had agreed

to plead guilty and to pay a $200 million fine for its role in a criminal price-fixing and bid-

rigging conspiracy involving the sale of Automotive Wire Harness Systems to automobile

manufacturers. Three executives, who are Japanese nationals, also agreed to plead guilty and to

serve prison time in the United States ranging from a year and a day to 18 months. (See Exhibit

A attached hereto).

75.    Furukawa is charged with price fixing in violation of the Sherman Act. *Id.*

76.    Furukawa has agreed to plead guilty for its role in a conspiracy to rig bids for and

to fix the prices of the sale of Automotive Wire Harnesses and related products sold to

automobile manufacturers in the United States and elsewhere. The DOJ announced in a press

release that Furukawa participated in the conspiracy from at least as early as January 2000, until at

least January 2010. Exhibit A.

77.    The plea agreements are an outgrowth of the DOJ's first charges in its ongoing

international cartel investigation of price fixing and bid rigging in the auto parts industry.

According to four separate one-count felony charges filed in the Unites States District Court for the

Eastern District of Michigan in Detroit, Furukawa and its executives—Junichi Funo, Hirotsugu

Nagata and Tetsuya Ukai—engaged in a conspiracy to rig bids for and to fix, stabilize and

maintain the prices of Automotive Wire Harness Systems sold to customers in the United States and elsewhere. (See Exhibit B attached hereto).

78.     According to the criminal Informations filed, Furukawa and its co-conspirators carried out the conspiracy by:

(a)     Participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)     Agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)     Agreeing, during those meetings, conversations, and communications, to allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis;

(d)     Agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e)     Submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)     Selling Automotive Wire Harness Systems to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)     Accepting payment for Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)     Engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)     Employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

(See Exhibit B).

79.     "As a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S.

consumers," said Sharis A. Pozen, Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division. "This cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped." (See Exhibit A).

80.     "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," said FBI's Special Agent in Charge Andrew G. Arena. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes." (See Exhibit A).

81.     According to the plea agreements, which are subject to court approval, Furukawa, Funo, Nagata and Ukai have all agreed to assist the DOJ in its ongoing investigation into the automotive parts industry. (See Exhibit A).

## Class Action Allegations

82.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

83.     Plaintiff also brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the state

antitrust, unfair competition, and consumer protection laws on behalf of the following class (the

"Damages Class"):

> All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, in states (as listed herein) having indirect purchaser laws, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

84.     Alternatively, Plaintiffs bring Damages Classes on behalf of all persons similarly

situated pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or respective state

statute(s), on behalf of all members of the following classes (collectively, the "State Classes"):

>       (a)     **Arizona**: All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

>       (b)     **California:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

>       (c)     **District of Columbia:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive

20

Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(d) **Florida:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(e) **Illinois:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(f) **Iowa:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(g) **Kansas:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(h) **Maine:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or

purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(i) **Massachusetts:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(j) **Michigan:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(k) **Minnesota:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(l) **Mississippi:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(m)    **Nebraska:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(n)    **Nevada:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(o)    **New Hampshire:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(p)    **New Mexico:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(q)    **New York:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive

Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(r) **North Carolina:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(s) **North Dakota:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(t) **Oregon:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(u) **South Carolina:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(v) **South Dakota:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or

purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(w)   **Tennessee:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(x)   **Utah:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(y)   **Vermont:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(z)   **West Virginia:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(aa)   **Wisconsin:** All car and truck dealers, parts suppliers and repair shops that, during the period January 1, 2000 to September 30, 2011, purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

85.     The Nationwide Class and the Damages Class are referred to herein as the "Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased Automotive Wire Harness Systems directly.

86.     While Plaintiff does not know the exact number of the members of the Classes, Plaintiff believes there are (at least) thousands of members in each Class.

87.     Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Automotive Wire Harness Systems sold in the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the conspiracy violated the Sherman Act, as alleged in Count I;

(e)     Whether the conspiracy violated state antitrust and unfair competition law, as alleged in Count II;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in Count III;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

(h)     The effect of the conspiracy on the prices of Automotive Wire Harness Systems sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiff and the members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

88.     Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Automotive Wire Harnesses purchased indirectly from Defendants or their co-conspirators.

89.     Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

90.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

91.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated entities and persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured entities and persons with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

92.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## Plaintiff and the Classes Suffered Antitrust Injury

93.     Defendants' price-fixing conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to Automotive Wire Harness Systems;

(b)     The prices of Automotive Wire Harness Systems have been fixed, raised, maintained, or stabilized at artificially inflated levels; and

(c)     Indirect purchasers of Automotive Wire Harness Systems have been deprived of free and open competition.

94.     During the Class Period, Plaintiff and the members of the Classes paid supra-competitive prices for Automotive Wire Harness Systems.

95.     The markets for Automotive Wire Harness Systems and the market for vehicles are inextricably linked and intertwined because the market for Automotive Wire Harness Systems exists to serve the vehicle market. Without the vehicles, the Automotive Wire Harness Systems have little to no value because they have no independent utility. Indeed, the demand for

vehicles creates the demand for Automotive Wire Harness Systems. As Lear stated in its 2010

Annual Report: "Our sales are driven by the number of vehicles produced by the automotive

manufacturers, which is ultimately dependent on consumer and fleet demand for automotive

vehicles."

96. Automotive Wire Harness Systems are identifiable, discrete physical products that

remain essentially unchanged when incorporated into a vehicle. As a result, Automotive Wire

Harness Systems follow a traceable physical chain of distribution from the Defendants to

Plaintiff and the members of the Classes, and any costs attributable to Automotive Wire Harness

Systems can be traced through the chain of distribution to Plaintiff and the members of the

Classes.

97. By reason of the alleged violations of the antitrust laws, Plaintiff and the members

of the Classes have sustained injury to their businesses or property, having paid higher prices for

Automotive Wire Harness Systems, related parts or vehicles containing Automotive Wire

Harness Systems than they would have paid in the absence of Defendants' illegal contract,

combination, or conspiracy, and, as a result, have suffered damages in an amount presently

undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish

and prevent.

98. By reason of the alleged violations of the antitrust laws, Plaintiff and the members

of the Classes have sustained injury to their businesses or property by losing sales and profits

because they paid higher prices for Automotive Wire Harness Systems, related parts or vehicles

containing Automotive Wire Harness Systems than they would have paid in the absence of

Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in

an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## Fraudulent Concealment

99. Plaintiff and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until no sooner than the February 2010 EC raids were first publicly reported.

100. Because Defendants' agreements, understandings and conspiracies were kept secret until February 2010, Plaintiff and members of the Classes before that time were unaware of Defendants' unlawful conduct, and they did not know before then that they were paying supra-competitive prices for Automotive Wire Harness Systems, related parts or vehicles containing Automotive Wire Harness Systems throughout the United States during the Class Period.

101. The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

102. By its very nature, Defendants' anti-competitive conspiracy was inherently self concealing. Automotive Wire Harness Systems, related parts or vehicles containing Automotive Wire Harness Systems are not exempt from antitrust regulation, and thus, before February 2010, Plaintiff reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' Automotive Wire Harness Systems and related product prices prices before February 2010.

103. Plaintiff and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and

30

their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination or conspiracy.

104.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until February 2010, when reports of the investigations into anti-competitive conduct concerning Automotive Wire Harness Systems were first publicly disseminated.

105.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and the members of the Classes have alleged in this Complaint.

## Count I
## Violation of Section 1 of the Sherman Act
## (on behalf of Plaintiff and the Nationwide Class)

106.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

107.     Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

108.     The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

109.     At least as early as January 2000, and continuing through the filing of this Complaint, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to

31

artificially fix, raise, stabilize and control prices for Automotive Wire Harness Systems and related products, thereby creating anticompetitive effects.

110.    The anti-competitive acts were intentionally directed at the United States market for Automotive Wire Harness Systems and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Automotive Wire Harness Systems and related products throughout the United States.

111.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Automotive Wire Harness Systems and related products.

112.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated indirect purchasers in the Nationwide Class who purchased Automotive Wire Harness Systems, related parts or vehicles containing Automotive Wire Harness Systems have been harmed by being forced to pay inflated, supra-competitive prices for such products.

113.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct get forth herein.

114.    Defendants' conspiracy had the following effects, among others:

      (a)    Price competition in the market for Automotive Wire Harness Systems and related products has been restrained, suppressed and/or eliminated in the United States;

      (b)    Prices for Automotive Wire Harness Systems and related products sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

      (c)    Plaintiff and members of the Nationwide Class who purchased Automotive Wire Harness Systems, related parts or vehicles containing Automotive Wire Harness Systems indirectly from Defendants and their

co-conspirators have been deprived of the benefits of free and open competition.

115. Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Automotive Wire Harness Systems, related parts or vehicles containing Automotive Wire Harness Systems purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

116. The alleged contract, combination, or conspiracy is *a per se* violation of the federal antitrust laws.

117. Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## Count II
## Violation of State Antitrust Statutes
## (on behalf of Plaintiff and the Damages Class)

118. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

119. From as early as January 2000 through the filing of this Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Automotive Wire Harness Systems and related parts in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

120. The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Automotive Wire Harness Systems and related parts and to allocate customers for Automotive Wire Harness Systems and related parts in the United States.

121.    In formulating and effectuating this conspiracy, Defendants and their co-

conspirators performed acts in furtherance of the combination and conspiracy, including:

    (a)    Participating in meetings and conversations among themselves during
           which they agreed to price Automotive Wire Harness Systems and related
           parts at certain levels, and otherwise to fix, increase, inflate, maintain, or
           stabilize effective prices paid by Plaintiff and members of the Damages
           Class with respect to Automotive Wire Harness Systems and related parts
           sold in the United States;

    (b)    Allocating customers and markets for Automotive Wire Harness Systems
           and related parts in the United States in furtherance of their agreements;
           and

    (c)    Participating in meetings and conversations among themselves to
           implement, adhere to and police the unlawful agreements they reached.

122.    Defendants and their co-conspirators engaged in the actions described above for

the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize

prices and to allocate customers with respect to Automotive Wire Harness Systems and related

parts.

123.    Defendants' anticompetitive acts described above were knowing, willful and

constitute violations or flagrant violations of the following state antitrust statutes.

124.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

125.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the California Business and Professions Code, §§ 16700, *et seq.*

126.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the District of Columbia Code Annotated §§ 284501, *et seq.*

127.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

128.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

129.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

130.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

131.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

132.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq.*

133.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

134.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

135.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

136.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*

137.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

138.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

139.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

140.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

141.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

142.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

143.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

144.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

145.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Carolina's Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

146.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

147.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

148.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

149.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

150.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

151.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

152.    Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiff and members of the Damages Class have paid more for Automotive Wire Harness Systems, related parts or vehicles containing Automotive Wire Harness Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

153.    Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiff and members of the Damages Class have lost sales and profits because they paid more for Automotive Wire Harness Systems, related parts or vehicles containing Automotive Wire Harness Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

154.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of members of the Plaintiff and the members of the Damages Class.

155.     Accordingly, Plaintiff and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys fees, to the extent permitted by the above state laws.

### Count III
### Unjust Enrichment
### (on behalf of Plaintiff and the Damages Class)

156.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

157.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Automotive Wire Harness Systems and related products.

158.     Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff of the members of the Damages Class for Automotive Wire Harness Systems and related products.

159.     Plaintiff and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct. Plaintiff and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the Damages Class may make claims on a pro rata basis.

## Prayer for Relief

Accordingly, Plaintiff respectfully requests that:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.     That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed:

        1.     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

        2.     A *per se* violation of Section 1 of the Sherman Act;

        3.     An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

        4.     Acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiff and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.     Plaintiff and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any

manner continuing, maintaining or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

F.     Plaintiff and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.     Plaintiff and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.     Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.     Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

Dated this ___ day of October, 2011.

LARSON • KING, LLP

By_____
Shawn M. Raiter #240424
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Phone: (651) 312-6500
Fax:    (651) 312-6618
Email: sraiter@larsonking.com

**CUNEO GILBERT & LaDUCA, LLP**
Jonathan W. Cuneo
Joel Davidow
Preetpal Grewal
Victoria Romanenko
507 C Street, N.E.
Washington, DC 20002
Phone: (202) 789-3960
Email: jonc@cuneolaw.com
      Joel@cuneolaw.com
      CharlesL@cuneolaw.com

**G JOHNSON LAW, PLLC**
Gregory Johnson
6688 145th Street West,
Apple Valley, MN 55124
Phone: 952-930-2485
Email: greg@gjohnsonlegal.com

***Attorneys for Plaintiff and the Putative Class***

1320137